**JAVERBAUM WURGAFT HICKS**
**KAHN WIKSTROM & SININS, P.C.**
By: Drake P. Bearden, Jr., Esquire
Attorney PA I.D. 308035
1000 Haddonfield-Berlin Road, Suite 203
Voorhees, NJ 08043
Telephone: (856) 596-4100 x 3050
Facsimile: (856) 702-6640
Email: dbearden@lawjw.com
Attorneys for Plaintiff

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NESHEMAH KEETIN, | : |
| | : |
| *Plaintiff*, | : |
| | : |
| | : CIVIL ACTION NO. 2:26-cv-05685 |
| v. | : |
| | : |
| PMC PROPERY MANAGEMENT | : |
| GROUP, RIVERWALK | : |
| APARTMENTS | : **COMPLAINT WITH JURY DEMAND** |
| | : |
| *Defendant.* | : |
| | : |

Plaintiff, Neshemah Keetin, residing in the State of Pennsylvania, by way of Complaint

against Defendants PMC Property Management Group ("PMC") and Riverwalk Apartments

("Riverwalk") says:

### INTRODUCTION

Plaintiff brings this suit against Defendants alleging that Defendants subjected her to a

hostile environment because of her gender and retaliated against her for engaging in protected

conduct in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq.

### PARTIES

1.      Plaintiff Neshemah Keetin was, at all times relevant herein, a woman residing in

the Commonwealth of Pennsylvania and a former resident of Riverwalk.

2.      Defendant PMC was, at all times relevant herein, a corporation registered and operating in the State of Pennsylvania, responsible for managing Riverwalk.

3.      Defendant Riverwalk was, at all times relevant herein, a corporation registered and operating in the State of Pennsylvania and an apartment building wherein Plaintiff previously resided.

## JURISDICTION

4.      This action is brought pursuant to the FHA. Jurisdiction is founded on 28 U.S.C. §§1331 and 1343(3) and the aforementioned statutory provisions.

5.      Jurisdiction lies under any state laws claims based on the principles of supplemental jurisdiction as codified at 28 U.S.C. §1367.

6.      The amount in controversy exclusive of interests and costs exceeds the minimum required amount of $75,000.

## VENUE

7.      The claims herein arose within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is accordingly invoked according to the dictates of 28 U.S.C. §1391(b) and (c).

## PLAINTIFF'S ALLEGATIONS

8.      The Plaintiff, who is a woman, was at all times relevant to her claims was diagnosed with Post-traumatic Stress Disorder ("PTSD") and autism.

9.      Plaintiff began renting an apartment in the Riverwalk apartments in Philadelphia PA in a 2021.

10.     During the entire time Plaintiff stayed at the Riverwalk apartments, Defendant PMC was a property management company which managed the property.

2

11.     Defendants Riverwalk and PMC (hereinafter referred to together as "Defendants") were responsible for management of the Riverwalk apartment including the conduct of employees and contractors working in or on the Apartment.

12.     From the time Plaintiff began staying at Riverwalk apartments, until the time she left, she was subjected to sexual harassment and retaliation on a regular basis.

13.     The sexual harassment and retaliation were so frequent and occurred over such a long period of time that it would be impossible for Plaintiff to identify every instance of sexual harassment and retaliation. However, for the purposes of this complaint, Plaintiff will identify numerous incidences of sexual harassment and retaliation.

14.     On or around August 15, 2022, a maintenance worker named Elijah[1] (last name unknown), who was an employee of Defendants came to Plaintiff's apartment to fix the washing machine.

15.     Upon Elijah entering her apartment, Plaintiff noticed that Elijah was leering at her in a sexually inappropriate way that made Plaintiff feel nervous and uncomfortable.[2]

16.     Elijah was staring at Plaintiff for a prolonged period of time in a sexual manner, focusing on her chest and lower body area.

17.     Because of her medical conditions identified above, Plaintiff was particularly impacted by this sort of leering by a man, especially someone who was alone with Plaintiff in her apartment.

---

[1] Plaintiff initially believed the worker's name was Sam, but later learned his name was Elijah.
[2] Throughout this complaint when Plaintiff uses the term "leering" that term is being used in its traditional sense to mean that the individual is looking or staring at her for a prolonged period of time in a sexually unpleasant, offensive, or predatory way. In particular, the individuals in question were leering at Plaintiff's chest and other parts of her body.

18. Plaintiff previously notified Defendants of her medical condition and requested an accommodation that she be notified at least 24 hours in advance if anyone was coming to her apartment to perform any work at her apartment.

19. Despite this accommodation request, on numerous occasions individuals came to Plaintiff's apartment without prior notification.

20. On August 15, 2022, after Elijah was leering at Plaintiff, she attempted to ignore his inappropriate behavior and directed him to the washer and dryer.

21. The following day, August 16, 2022, Elijah returned to Plaintiff's apartment in the morning unannounced.

22. On or around 9:00 am, Elijah knocked on Plaintiff's door twice and then used his key to enter her apartment.

23. At the time, Plaintiff was in her bed not fully dressed.

24. When Elijah entered Plaintiff's apartment, Plaintiff began screaming at him multiple times to "get out" and leave her apartment.

25. However, Elijah stood in Plaintiffs bedroom doorway staring at her stating that he needed to fix her washer.

26. Plaintiff reported this incident to the assistant property manager at Defendants, Biryanna Ashley.

27. Plaintiff told Ashley everything that occurred.

28. Ashley never responded to Plaintiff's Complaint.

29. On or around December 16, 2022, another maintenance worker whose name Plaintiff does not know entered Plaintiff's apartment unannounced while she was not dressed.

30. Plaintiff reported this incident to the property manager, Diane Green, via e-mail.

4

31.    Again, Plaintiff complained to Green about the fact employees of Defendants were entering her apartment without her consent, despite the fact she asked for an accommodation that she be notified in advance before anyone entered her apartment.

32.    Plaintiff told Green that employees entering her apartment without her permission was impacting her because of her disability, violated her privacy, and was sexually harassing.

33.    Plaintiff reiterated to Green that she requested 24-hour notice before anyone entered her apartment because of her disability. However, Defendants continued not to honor this request.

34.    In 2022 and going into 2023, Plaintiff noticed that two employees of Defendants who were painters were leering at Plaintiff when she walked to or from her apartment.

35.    In addition to the painter's leering at Plaintiff, the painter's supervisor sat in a minivan and whenever Plaintiff left the building, he would also leer at Plaintiff.

36.    The painter's supervisor repeatedly sat in his van and when Plaintiff passed him, he would stare at Plaintiff for a prolonged period looking up and down her body while fixating on her chest and lower body.

37.    This leering by the painter's supervisor continued on a regular basis in 2022 and 2023.

38.    In or around May 2023, one of the painters, Perry (last name unknown) came to Plaintiff's apartment to perform maintenance and replace an HVAC motor.

39.    When Plaintiff saw that Perry, the individual she previously noticed leering at her, was the person who came to her apartment to perform maintenance, Plaintiff immediately became uncomfortable.

5

40.    As before, Defendants failed to provide Plaintiff with 24-hour notice that an individual was coming to her apartment as she had requested.

41.    Perry began making conversation with Plaintiff and flirting with her, which was unwelcomed by Plaintiff.

42.    Perry then left a Post-it note on Plaintiff's computer and wrote down his cell phone number and told Plaintiff to call him.

43.    Plaintiff did not call Perry.

44.    On or around June 5, 2023, Plaintiff saw Perry in the front of the building, and he said to her in a flirtatious tone that she was supposed to call him.

45.    Plaintiff told Perry that she would not be calling his cell phone.

46.    On around June 5, 2023, Plaintiff reported this incident to Green via e-mail.

47.    In Plaintiff's complaint to Green, Plaintiff reiterated that she had previously made complaints about the sexually inappropriate conduct of Defendants' employees and this was a continuation of that conduct.

48.    Plaintiff also stated to Green that the painters had been inappropriately leering at her in the building.

49.    Plaintiff also reported the painter's supervisor's sexual harassment to Green in this e-mail.

50.    Plaintiff told Green this was not the first time she reported sexual harassment, and she believed the behavior of the employees was inappropriate, unacceptable and disgusting.

51.    Despite Plaintiff's multiple complaints about sexual harassment, the harassment from Defendants' employees continued into 2024.

52. While Plaintiff resided at the Riverwalk apartments, a janitor named Dave (last name unknown) worked for Defendants.

53. In or around May or June 2021, Dave repeatedly sexually harassed Plaintiff including leering at her and making cat calls when Plaintiff walked by.

54. At one point, Dave approached Plaintiff and said to her "you can call me chocolate daddy."

55. Dave then got down on his hands and knees and started shaking his butt while saying to Plaintiff in a sexual tone "I will do whatever you want me to do."

56. Plaintiff quickly walked away from Dave while shaking her head and saying "no," to him.

57. In or around 2024, Dave shifted from working primarily outside to working inside Plaintiff's apartment building for Defendants.

58. Plaintiff noticed that Dave would wait in the lobby area every day when she walked her dog around 9:00 am and 12:00 noon.

59. Plaintiff initially ignored Dave when he was in the lobby at the same time she was there, but eventually he became more aggressive when she ignored him.

60. In or around April 2024 until July 2024, Dave began leering at Plaintiff whenever she came to the lobby to walk her dog.

61. Dave would appear in the lobby and whenever Plaintiff walked by Dave leered at Plaintiff looking up and down her body while focusing on her chest and lower body.

62. This conduct by Dave made Plaintiff feel extremely uncomfortable.

63. During that same period, Dave then began sitting out front so that he could leer at Plaintiff every time she walked her dog.

7

64. Plaintiff felt so uncomfortable with Dave's conduct that she began exiting through the back of the building to avoid his sexual harassment.

65. When Plaintiff began trying to avoid Dave, he approached Plaintiff and began talking to her.

66. On several occasions, Dave asked Plaintiff to speak with him, stating that he was a "good guy."

67. Dave also continued to tell Plaintiff to call him "chocolate daddy."

68. Plaintiff told Dave to stop. However, he continued to harass her.

69. Dave followed Plaintiff into the basement when he saw she was attempting to walk in through the back of the building.

70. Dave followed Plaintiff to the elevator and continued leering at her as he followed her.

71. When Dave continued to speak to Plaintiff and sexually harass her, Plaintiff told him in a loud voice to stop.

72. On or around July 11, 2024, Plaintiff reported the sexual harassment from Dave to Green.

73. On or around July 11, 2024, Plaintiff also spoke with the assistant property manager, Shannon McDevitt, and reported the sexual harassment from Dave.

74. After Plaintiff reported Dave's sexual harassment, Defendant temporarily removed Dave from the property.

75. However, in or around September 2024, Defendant returned Dave to the property, and he continued to sexually harass Plaintiff in the same manner as he had in the past.

76.    Dave continued to leer at Plaintiff on a daily basis, attempted to speak with her and told her to call him chocolate daddy.

77.    Dave's sexual harassment of Plaintiff impacted her disability causing Plaintiff to experience physical pain in her body which resulted in Plaintiff needing to take days off work.

78.    The security guard on duty at Defendants, Wynter Burton, witnessed Dave's sexual harassment of Plaintiff.

79.    The sexual harassment and the impact it caused Plaintiff impacted Plaintiff's ability to perform her job, and Plaintiff was terminated from her employment on or around November 8, 2024.

80.    In 2024 and continuing into 2025, another resident of the apartment building, Ben (last name unknown) sexually harassed Plaintiff.

81.    Plaintiff complained about the sexual harassment from Ben to Defendants' employees.

82.    On or around March 9, 2025, Plaintiff reported the sexual harassment to Burton and said she was going to limit her interactions with anyone in the lobby because of the sexual harassment from Ben.

83.    Burton told Plaintiff she should not bring her concerns to Burton and needed to take them to management.

84.    Plaintiff later learned that Burton logged Plaintiff's complaint in the incident book as a resident disagreement and not as sexual harassment like Plaintiff reported.

85.    After a Plaintiff made this complaint about sexual harassment to Burton, both Burton and another employee of Defendants, AB, who was a janitor, began retaliating against Plaintiff.

9

86. The retaliation continued daily from March 2025 through August 2025.

87. Burton's retaliation initially began as Burton refusing to acknowledge Plaintiff whenever she walked through the lobby while Burton would acknowledge every other resident by pleasantly greeting them with a "hello."

88. Prior to Plaintiff's complaints to Burton about sexual harassment, Burton did not treat Plaintiff this way and instead treated Plaintiff like all the other residents.

89. This was troubling to Plaintiff because all the other employees and residents observed how Burton disrespected Plaintiff and treated her differently.

90. Burton's conduct was also troubling because Plaintiff reported the harassment to Burton seeking protection and instead Burton retaliated against her.

91. Plaintiff also believes Burton recruited another employee, AB, to retaliate against her.

92. On or around March 19, 2025, Plaintiff complained to Burton's supervisor, Brandon Grant, about the sexual harassment from Ben, and Burton's retaliation against him.

93. Plaintiff hoped that after she reported Burton's retaliation to Grant, it would stop. However, Burton instead increased the retaliation.

94. After Plaintiff reported Burton's retaliation to Grant, Burton then enlisted AB to assist in the retaliation against Plaintiff.

95. When Plaintiff walked through the lobby, AB would be at the security desk and said, "HELLO" to Plaintiff in a loud and aggressive manner to intimidate Plaintiff.

96. This conduct was even more intimidating because AB was a 6-foot-one-inch, 250-pound man, and Plaintiff was a much smaller woman.

97.     AB also told Grant that he better protect his niece, which was a reference to Burton. Plaintiff understood AB's statement to mean that Grant should disregard Plaintiff's sexual harassment and retaliation complaints.

98.     On or around April 18, 2022, Plaintiff sent an e-mail correspondence to Green complaining about the retaliation from Burton and AB.

99.     Green did not respond to Plaintiff's e-mail so on or around May 20, 2025, Plaintiff sent another e-mail to Green complaining about the retaliation.

100.    On or around May 22, 2025, Plaintiff met with Green to discuss the retaliation and prior sexual harassment.

101.    After the meeting, on May 22, 2025, Plaintiff sent a follow-up e-mail correspondence to Green memorializing what was said during their conversation.

102.    After Plaintiff sent the May 22, 2025, e-mail correspondence to Green, she stopped communicating with Plaintiff.

103.    Green no longer responded to Plaintiff's complaints about sexual harassment or retaliation.

104.    After Plaintiff reported the retaliation to Green, the retaliation from Burton and AB became even worse.

105.    On or around May 25, 2025, AB attempted to physically walk through Plaintiff while she was in her apartment building almost knocking Plaintiff on the ground.

106.    As Plaintiff was waiting for the elevator on the 14th floor, AB came out of the elevator, and he aggressively walked right at Plaintiff, and she jumped back out of the way to avoid the physical collision.

107.    If Plaintiff had not jumped out of the way, AB would have knocked Plaintiff over.

11

108.    Burton also went from ignoring Plaintiff to laughing at Plaintiff when she walked through the lobby.

109.    Burton laughed at Plaintiff and said to Plaintiff that she enjoyed laughing at her.

110.    When Burton made this comment, Plaintiff said, "excuse me," to which Burton responded by repeating her comment that she enjoyed laughing at Plaintiff.

111.    Burton told Plaintiff she did not care if Plaintiff reported her to management.

112.    On or around May 25, 2025, Plaintiff sent an e-mail correspondence to the vice president of human resources, Catherine Bruno, and to the owner of Defendant Ron Kaplan.

113.    In that e-mail, Plaintiff complained about the sexual harassment she was subjected to, and the fact that employees were now retaliating against her for complaining about sexual harassment and complaining about the retaliation.

114.    On or around May 27, 2025, Bruno responded to Plaintiff that Defendants would look into her complaint.

115.    Defendants initially did not remove Burton, but eventually moved her from the North Tower, where Plaintiff resided, to the South Tower, which was about 300 feet away.

116.    Burton continued to travel to the North Tower and retaliate against Plaintiff.

117.    Because of the sexual harassment and retaliation and Defendant's failure to stop the conduct, Plaintiff felt she had no other choice but to seek residency in another residence.

118.    In September and October 2025, Plaintiff sought the assistance of sexual harassment, domestic violence and victim advocacy groups to be relieved from her lease.

119.    However, instead of working with Plaintiff, on or around October 27, 2025, Defendants initiated eviction proceedings against Plaintiff.

120.    Plaintiff has been forced to leave her residency with Defendants because of Defendants' conduct.

## LEGAL AVERMENTS

121.    Plaintiff is a member of a protected class under the FHA as a woman and an individual who engaged in protected conduct.

122.    Plaintiff engaged in protected conduct when she complained about sexual harassment and retaliation and requested an accommodation.

123.    After Plaintiff engaged in protected conduct, Plaintiff was subjected to adverse actions that included, but were not limited to, being harassed, physically intimidated, and forced to leave her apartment.

124.    A determinative or motivating factor in the adverse actions Defendant took against Plaintiff was Plaintiff's membership in the protected categories as outlined in this Complaint.

125.    Plaintiff was subjected to harassment that was severe and pervasive.

126.    Plaintiff was subjected to the harassment outlined above because she is a woman.

127.    A reasonable woman would find the harassment Plaintiff was subjected to so severe and pervasive that the environment was altered and became hostile, intimidating or offensive.

128.    The harassment was purposeful, intentional and willful, and was either undertaken by members of upper management or members of upper management were willfully indifferent to the harassment.

13

129.    Because the harassment was intentionally egregious and because members of upper management either participated in the harassment or were willfully indifferent to the harassment, punitive damages are warranted.

130.    Defendants are responsible for the harassment because they failed to reasonably promulgate a policy prohibiting the harassment.

131.    Defendants are also liable for the harassment because Defendants delegated to the harassing individuals the authority to control the environment, and the harassing individuals abused that authority to create a hostile environment.

132.    Defendants are also liable in this matter because they knew or should have known about the harassment and failed to take prompt and effective remedial measures to stop it.

133.    Punitive damages are warranted in this matter because members of upper management were both directly involved in the unlawful conduct and were willfully indifferent to the unlawful conduct.

134.    The retaliation and harassment adversely impacted the terms, conditions, or privileges of Plaintiff's use and enjoyment of her rental apartment in violation of the FHA.

135.    Defendants' conduct coerced, intimidated, threatened, and interfered with Plaintiff's right to the exercise and enjoyment of her rights protected by the FHA.

136.    As a result of the unlawful conduct outlined above, Plaintiff has been forced to suffer economic and non-economic harm.

### COUNT I
### SEXUAL HARASSMENT UNDER THE FHA

137.    Plaintiff hereby repeats and realleges the preceding paragraphs as though fully set forth herein.

14

138.    Plaintiff was subjected to harassment based on her gender, which had an adverse effect on her.

139.    The harassment adversely impacted the terms, conditions, or privileges of Plaintiff's use and enjoyment of her rental apartment in violation of the FHA.

**WHEREFORE**, Plaintiff demands judgment against the Defendants jointly, severally and in the alternative, together with compensatory damages, including emotional pain and suffering, punitive damages, interest, cost of suit, attorneys' fees, enhanced attorneys' fees, economic damages, equitable back pay, equitable front pay, equitable reinstatement, equitable instatement or promotion, and any other relief the Court deems equitable and just.

**COUNT II**
**<u>RETALIATION UNDER THE FHA</u>**

140.    Plaintiff hereby repeats and realleges the preceding paragraphs as though fully set forth herein.

141.    Plaintiff engaged in protected activity under FHA as articulated at length in this Complaint.

142.    Subsequent to Plaintiff engaging in the protected activity outlined above, Defendant subjected her to adverse actions as outlined above.

143.    Defendants' conduct coerced, intimidated, threatened, and interfered with Plaintiff's right to the exercise and enjoyment of her rights protected by the FHA.

**WHEREFORE**, Plaintiff demands judgment against the Defendants jointly, severally and in the alternative, together with compensatory damages, including emotional pain and suffering, punitive damages, interest, cost of suit, attorneys' fees, enhanced attorneys' fees, economic damages, equitable back pay, equitable front pay, equitable reinstatement, equitable

instatement or promotion, and any other relief the Court deems equitable and just.

144.   Plaintiff requests the following equitable remedies and relief in this matter:

a.   Plaintiff requests a declaration by this Court that the practices contested herein violate Federal law as set forth herein.

b.   Plaintiff requests that this Court order the Defendant to cease and desist all conduct inconsistent with the claims made herein going forward, both as to the specific Plaintiff and as to all other individuals similarly situated.

c.   Plaintiff requests, that in the event that equitable reinstatement and/or equitable back pay and equitable front pay is ordered to the Plaintiff, that all lost wages, benefits, fringe benefits and other remuneration is also equitably restored to the Plaintiff.

d.   Plaintiff requests that the Court order the Defendant to alter its files so as to expunge any reference to which the Court finds violates the statutes implicated herein.

e.   Plaintiff requests that the Court do such other equity as is reasonable, appropriate and just.

JAVERBAUM WURGAFT HICKS KAHN
WIKSTROM & SININS, PC

By:  */s/ Drake P. Bearden, Jr.*

Drake P. Bearden, Jr.
Attorneys for Plaintiff

Dated:  August 10, 2026

**DEMAND TO PRESERVE EVIDENCE**

16

1.    All Defendants are hereby directed and demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to Plaintiff's cause of action and/or prayers for relief, to any defenses to same, and pertaining to any party, including, but not limited to, electronic data storage, closed circuit TV footages, digital images, computer images, cache memory, searchable data, emails, spread sheets, employment files, memos, text messages and any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, twitter, MySpace, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

2.    Failure to do so will result in separate claims for spoliation of evidence and/or for appropriate adverse inferences.

**JAVERBAUM WURGAFT HICKS KAHN**
**WIKSTROM & SININS, P.C.**


*s/ Drake P. Bearden, Jr.*
Drake P. Bearden Jr.
Attorney for Plaintiff


Dated:   August 10, 2026

17

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

**JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.**


*s/ Drake P. Bearden, Jr.*
Drake P. Bearden Jr.

Dated:  August 10, 2026